# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

_____

MICHAEL PETERSON, and
MICHAEL PETERSON AS THE
PERSONAL REPRESENTATIVE
FOR THE ESTATE OF JOSHUA
PETERSON,

               Plaintiffs,

     vs.

TIME INSURANCE COMPANY,
ASSURANT HEALTH,
JOHN ALDEN LIFE INSURANCE
COMPANY, AETNA US HEALTH CARE,
AETNA HEALTH & LIFE INSURANCE
COMPANY, and JOHN DOES 1, 2, and 3,

               Defendants.

CV 11-81-M-DWM-JCL

ORDER

and

FINDINGS AND
RECOMMENDATION
OF UNITED STATES
MAGISTRATE JUDGE

_____

Plaintiff Michael Peterson ("Peterson") brings this action on his own behalf

and on behalf of his deceased son, alleging that all of the above-named Defendants

wrongfully denied and improperly processed claims for benefits under certain

health insurance policies. Defendants Time Insurance Company, Assurant Health,

and John Alden Life Insurance Company have moved to dismiss some of

Peterson's claims under Fed. R. Civ. P. 12(b), and for summary judgment as to the rest.[1] For the reasons set forth below, these Defendants' motions to dismiss and for summary judgment should both be granted with the exceptions noted below.

## I.  **Background**

The Court notes at the outset that Peterson has not submitted a Statement of Genuine Issues in response to John Alden's summary judgment motion as required by Local Rule 56.1(b).  While Peterson states that he disputes essentially every fact upon which John Alden relies in moving for summary judgment, his response brief does not specifically cite any contradictory evidence of record.   The only evidentiary materials that Peterson submitted in conjunction with his response brief were two of his own affidavits and three unauthenticated letters – one from Peterson's former fiancee, one from his doctor, and one from the office of the Montana State Auditor.[2] Dkt. 76-1 through 76-6.  Peterson's affidavits are filled

---

[1]  John Alden is the entity that insures Peterson, and "Assurant Health" is a brand name used by John Alden to underwrite and issue insurance products.  Dkt. 70-2, ¶ 3.  The following discussion applies equally to all three moving Defendants.  For purposes of simplicity, the Court will refer to the moving Defendants as "John Alden."

[2]  Peterson has also filed an unauthenticated audio recording of two voicemail messages purportedly left on his telephone by a representative of Aetna Health and Life Insurance Company – another named defendant.  But because Aetna is not a party to this motion, the audio recording is irrelevant to the present discussion.

with subjective arguments and legal conclusions, but contain few statements based on personal knowledge setting out facts that would be admissible in evidence as required by Fed. R. Civ. P. 56(c)(4).

On February 27, 2012, the Court convened a hearing on John Alden's motions. At the request of Plaintiffs' counsel, the Court allowed Peterson to testify. Peterson's testimony at the hearing was, in substance, very similar to that set forth in his affidavit. The Court also allowed Peterson to introduce two checks issued by Defendant Time Insurance Company as exhibits at the hearing. Dkt. 93.

Because Peterson has not complied with Local Rule 56.1(b), however, and has for the most part failed to support his responsive arguments with citations to any evidentiary materials of record, many of the facts upon which John Alden relies and for which it has provided evidentiary support are properly considered as undisputed for summary judgment purposes. Fed. R. Civ. P. 56(e). Nonetheless, the Court will consider Peterson's responsive arguments and takes the following factual background from the materials submitted by both parties.

The events giving rise to this litigation date back to May 2008, when Peterson submitted an enrollment form for medical insurance to Defendant John Alden Life Insurance Company ("John Alden"). Dkt. 70-3. Peterson identified himself and his son, Joshua, as proposed insureds on the enrollment form. Dkt.

70-3, at 1. On June 5, 2008, John Alden issued a Certificate of Medical Coverage ("Certificate") designating Peterson as the policyholder and Joshua as a dependent. Dkt. 70-4, at 1 & 7. As originally issued, the Certificate would have provided Peterson and Joshua with coverage effective May 2, 2008, subject to a calendar year deductible of $3,000 per individual. Dkt. 70-2, ¶¶ 7-8. But because Peterson had COBRA coverage through the end of June 2008,[3] on June 5, 2008, he requested that the Certificate's effective date be changed to July 1, 2008.[4] Dkt. 83-1. Peterson also asked that the deductible be changed to $5,000. Dkt. 70-2, ¶ 6; Dkt. 83-1, at 1. John Alden implemented both of those changes. Dkt. 70-6; 70-7.

As originally issued, the Certificate also carried a permanent rider stating the policy did not cover "lipoma, including any diagnostic procedures, treatment, surgery or complications thereof." Dkt. 70-5, at 38. By Peterson's own account, John Alden advised him on August 7, 2008, that it was removing the rider at his

---

[3] At the February 27, 2012, hearing, Peterson also stated that he asked to change the effective date of coverage because John Alden had "pre-diagnosed" him with liposarcoma. The undisputed fact remains that the effective date of coverage was changed to July 1, 2008, at Peterson's direction.

[4] Peterson had medical insurance coverage through his prior employment. That coverage was provided through a policy of insurance issued by Aetna Health & Life Insurance Company - another named Defendant.

request effective July 1, 2008.  Dkt. 76-3, ¶ 117.

As modified, Peterson's Certificate provided that once a covered person had incurred $5,000 of covered charges, John Alden would begin to pay 80% of the cost of services rendered by a participating health care provider,[5] and 65% of the costs of services rendered by a non-participating provider.  Dkt. 70-4, at 8.  The Certificate also set forth annual out-of-pocket limits, pursuant to which a covered person would be responsible for no more than $8,500 of covered charges attributable to treatment received from participating providers, and no more than $21,000 of covered charges attributable to treatment obtained from non-participating providers.  Dkt. 70-1, ¶ 15; Dkt. 70-4, at 8.

In April 2008, Peterson sought treatment for a bump on his foot that his doctor first believed was a ganglion cyst.  Dkt. 76-5.  The mass was excised on June 11, 2008.  Dkt. 76-3, ¶ 51; Dkt. 76-5.  After receiving the pathology report, Peterson's physician diagnosed the mass as a liposarcoma.  Dkt. 76-5.  Peterson was then referred to the University of Utah Huntsman Hospital for surgery and related treatment.  Dkt. 70-2, ¶ 31.  Peterson thereafter submitted multiple claims for benefits seeking coverage for the cost of his medical treatment.  And beginning

---

[5] A participating provider is one who participates in John Alden's Health Care Provider Network, and has agreed to accept a contracted rate as payment in full for specific treatment, services, or supplies.  Dkt. 70-2, ¶¶9-11.

in 2009, Peterson submitted claims for benefits seeking coverage for the cost of medical treatment provided to his son Joshua. Dkt. 70-2, ¶¶ 29, 38.

In support of its motion for summary judgment, John Alden has submitted the declaration of claims processing supervisor Kisha Banks-Matthews, who states that she reviewed all of Peterson's claims and summarizes the company's handling and payment of those claims. Dkt. 70-2. The Banks-Matthews declaration reflects that between 2008 and 2010, Peterson submitted claims totaling $106,687.62 for the cost of his own medical care and that received by his son. Dkt. 70-2, ¶¶ 29, 38-40. Of that amount John Alden ultimately determined that $80,697.35 related to covered charges. Dkt. 70-2, ¶¶ 29, 38-40. After accounting for the yearly $5,000 deductibles, coinsurance, copayments, and access fees, John Alden paid $59,536.25 pursuant to the terms of the Certificate. Dkt. 70-2, ¶¶ 29, 38-40; 70-5, at 1.

As of November 21, 2011, which marks the approximate date of John Alden's summary judgment motion, Peterson had submitted claims for charges totaling $14,121.86 for medical treatment he received in 2011. Of that amount, John Alden determined that $13,182.52 related to covered charges, and paid $6,245.89. Dkt. 70-2, ¶ 41. Peterson also submitted claims seeking coverage of the cost of Joshua's treatment in 2011, but John Alden denied those claims on the

ground that Peterson had removed his son from coverage under the Certificate as of September 1, 2010.  Dkt. 70-2, ¶ 45.

Peterson commenced this action in May 2011, alleging that he and his son "made claims upon the Defendants' policies covering Plaintiffs' health needs and the Defendants refused to cover the Plaintiffs and/or properly adjust their claims." Dkt. 51, ¶ 11.  Peterson contends there was a several month period after his surgery in 2008 during which Defendants wrongfully denied his claims for coverage, thereby causing him extreme financial and emotional hardship.  Dkt. 76-3.  Peterson maintains that he still has not received all of the benefits due him under the Certificate.  Dkt. 76-3.

Peterson asserts claims against all named Defendants for breach of contract (Count I), violation of Montana's Unfair Trade Practices Act, Mont. Code Ann. § 33-18-101 et seq. ("UTPA") (Count II), tortious breach of statutory duties (Count III), constructive fraud and breach of fiduciary duties (Count IV), negligent infliction of emotional distress (Count V), and intentional infliction of emotional distress (Count VI).  Dkt. 51.

Defendants Time Insurance Company, Assurant Health, and John Alden Life Insurance Company have moved under Fed. R. Civ. P. 12(b)(6) to dismiss Peterson's claims for constructive fraud, negligent and intentional infliction of

emotional distress, and some of his UTPA claims. The same Defendants have moved for summary judgment as to the rest of Peterson's UTPA claims and his breach of contract claim.

## II.   Applicable Legal Standards

### A.   Rule 12(b)(6) Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Iqbal*, 129 S.Ct. at 1949. The purpose of this pleading requirement is to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*,129 S.Ct. at 1949 (*quoting Twombly*, 550 U.S. at 570). This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129

S.Ct. at 1949. Factual allegations that are simply consistent with a defendant's liability stop "short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 129 S.Ct. at 1949 (*quoting Twombly*, 550 U.S. at 557.)

In other words, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. The allegations in a complaint must rise above the level of mere speculation, but need only "raise a reasonable expectation that discovery will reveal evidence of" a basis for liability. *Twombly*, 550 U.S. at 555-56.

In determining whether this standard is satisfied, the court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiffs. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. "Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049, 1055 (9th Cir. 2008). Assessing a claim's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950

## B.    Rule 56 Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S.  317, 324 (1986).  The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials" of the pleadings.  *Anderson*, 477 U.S. at 248.

The court may consider a properly supported assertion of fact as undisputed

for purposes of a motion for summary judgment when response or reply requirements are not satisfied. Fed. R. Civ. P. 56(e)(2); Advisory Committee Notes to 2020 Amendments.

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

## III. Discussion

### A. Negligent and Intentional Infliction of Emotional Distress

John Alden moves to dismiss Peterson's claims for negligent and intentional infliction of emotional distress (Counts V & VI) on the ground that they are barred by the plain language of Montana's UTPA, which limits the types of claims that are available to an insured in certain situations. The UTPA specifically states that:

> An insured who has suffered damages as a result of the handling of an insurance claim may bring an action against the insurer for breach of the insurance contract for fraud, or pursuant to this section, but not under any other theory or cause of action.

Mont. Code Ann. § 33-18-242(3).

The Montana Supreme Court has enforced the plain terms of this statute, indicating that it "will not second guess the intent of the Legislature in its desire to explicitly limit the liability of insurers."[6] *Watters v. Guaranty National Insurance Co.*, 3 P.3d 626, 636 (Mont. 2000), overruled on other grounds *Shilhanek v. D-2 Trucking, Inc.*, 70 P.3d 721, 727 (Mont. 2003). "The claims available to an insured stemming from an insurer's handling of an insurance claim are only those causes of action recognized under the statute – breach of contract, fraud, or violations of the UTPA – and no other cause of action is permitted." *West .v State Farm Mut. Auto. Ins. Co.*, 2011 WL 2559966, at *15 (D. Mont. June 28, 2011) (citing *Watters*, 3 P.3d at 636). *See also Burton v. State Farm Mutual Automobile Ins. Co.*, 30 M.F.R. 173, 182 (D. Mont. 2002) (explaining that "[a]n insured may not bring suit against an insurance company for claims arising out of the handling of an insurance claim, unless the claims are those set forth in sections [33-18-201 and 33-18-242(3)] of the UTPA").

Peterson's claims for negligent and intentional infliction of emotional distress are premised entirely on the alleged mishandling of the insurance claims

---

[6]  Because jurisdiction over this action is founded upon diversity of citizenship, the Court applies the substantive law of Montana. *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

he and his son submitted. Dkt. 51, ¶¶ 39-58. Peterson accuses John Alden of negligently and intentionally refusing to provide coverage or pay for medical care, and alleges he and his son suffered severe emotional distress as the result of John Alden's failure to fairly or reasonably evaluate their claims, effectuate coverage, or provide a reasonably prompt settlement. Dkt. 51, ¶¶ 39-58. Because Peterson's emotional distress claims are premised entirely on John Alden's alleged conduct in the handling of insurance claims, they are barred by Mont. Code Ann. § 33-18-242(3).[7]

Peterson does not address this statute in his response brief. He instead argues that the emotional distress claims set forth in the Amended Complaint are actually claims for breach of fiduciary duty. But the two claims are expressly pled as claims for negligent and intentional infliction of emotional distress. Even if they could somehow be construed as claims for breach of fiduciary duty, it would make no difference. A claim for breach of fiduciary duty stemming from alleged improper claims handling is not one of those authorized by Mont. Code Ann. § 33-18-242(3). Because Counts V & VI of the Amended Complaint are unequivocally

---

[7] The fact that an insured may not prosecute an independent claim for emotional distress emanating from the handling of an insurance claim does not mean the insured cannot pursue emotional distress damages under a UTPA claim. *Jacobsen v. Allstate Ins. Co.*, 215 P.3d 649, 662-63 (Mont. 2009).

barred by Mont. Code Ann. § 33-18-242(3), they should be dismissed.

### B. Constructive Fraud

John Alden moves to dismiss Peterson's claim for constructive fraud (Count IV) on the ground that it is not pled with the particularity required under Fed. R. Civ. P. 9(b).

It is well-established "that Rule 9(b)'s particularity requirement applies to state-law causes of action" like Peterson's constructive fraud claim. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). *See also Guerrero v. Greenpoint Mortgage Funding, Inc.*, 403 F. App'x 154, 156 (9th Cir. 2010). "Rule 9(b) demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct...so that they can defend against the charge and not just deny that they have done anything wrong.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). In other words, the party alleging fraud must provide "the who, what, when, where, and how of the misconduct charged." *Kearns*, 567 F.3d at 1124. This means that a plaintiff "must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Schreiber Distributing Co. v. ServWell Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

-14-

While the "Rule 9(b) requirement that the *circumstances* of the fraud must be stated with particularity is a federally imposed rule," the federal court looks to "state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action."[8] *Vess*, 317 F.3d at 1103 (emphasis in original). Constructive fraud is defined by statute in Montana as:

> (1) any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him; or
>
> (2) any such act or omission as the law especially declares to be fraudulent, without respect to actual fraud.
>
> Mont. Code Ann. § 28-2-406.

To establish a prima facie case of constructive fraud in Montana, the party asserting the claim must establish the following elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the hearer's ignorance of the its falsity; (6) the hearer's reliance upon its truth; (6) the hearer's right to rely upon it; and (8) the hearer's

---

[8]  The Montana Supreme Court has likewise held that a claim for constructive fraud must comply with the particularity requirement of Mont. R. Civ. P. 9(b), which is the state counterpart to the federal rule and requires that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity."  *See Town of Geraldine v. Montana Mun. Ins. Authority*, 198 P.3d 796, 801 (Mont. 2008).

consequent and proximate injury or damage. *Town of Geraldine,* 198 P.3d at 801 (Mont. 2008) (stating that a claim of constructive fraud requires proof similar to that required for a claim of actual fraud, except that a plaintiff need not prove the speaker's intent to deceive or dishonesty of purpose).

As set forth in Count IV of the Amended Complaint, the substantive allegations of Peterson's constructive fraud claim read in full and verbatim as follows:

32. The Defendants owed Plaintiffs fiduciary duties, including the highest standards of honesty, full disclosure, and utmost good faith and fair dealing. Violation of such duties constitutes constructive fraud.

33. The Defendants violated said duties repeatedly and intentionally, as set forth above.

34. The Defendants had an obligation to promptly investigate, evaluate, and settle and adjust this claim, promptly and in good faith.

35. The Defendants failed and refused to honor such duties. Instead, the Defendants adopted a course of delay, refusal to state a position or settle, and refusal to disclose any basis, in fact, or in law, for their denials, and refusal to negotiate or pay the claim or provide coverage.

36. The Defendants' tortuous [sic] conduct caused Plaintiffs' special and general damages.

These conclusory allegations are not sufficient to meet the heightened pleading requirements of Rule 9(b). Peterson's constructive fraud claim says nothing about the specific circumstances of the alleged fraud. It does not

differentiate between the multiple Defendants, does not identify any false or misleading statements or representations, and does not specify when the alleged fraud was to have taken place. Nor does this information appear anywhere else in the Amended Complaint. Peterson has thus failed to state with particularity the who, what, and when of the alleged constructive fraud, all of which are required by Rule 9(b). Because Peterson has not alleged the circumstances constituting John Alden's alleged constructive fraud with the particularity required by Rule 9(b), Count IV of the Amended Complaint should be dismissed.[9]

The Court is mindful that where a claim of fraud is dismissed for failing to satisfy the particularity requirements of Rule 9(b), leave to amend should generally be granted. *United States v. Corintian Colleges*, 655 F.3d 984, 994 (9th Cir. 2011). Thus, Peterson should be afforded an opportunity to amend this claim.

## C.    Montana Unfair Trade Practices Act Claims

Counts II and III of Peterson's Amended Complaint assert claims against all Defendants for violations of the UTPA. In Count II, Peterson alleges broadly that "Defendants violated Montana's Unfair Trade Practices Act." Dkt. 51, ¶ 22. In

---

[9] Peterson argues that John Alden's motion "is just a harassing redo of [its] first motion to dismiss" for failure to state a claim under Rule 12(b)(6). Dkt. 76, at 18. But this is John Alden's first motion to dismiss. The prior motion to which Peterson is presumably referring was filed by Aetna, and had nothing to do with John Alden. See Dkt. 31.

Count III, Peterson alleges a "tortious breach of statutory duties," and claims more specifically that "Defendants violated M.C.A. 33-18-201(1),(2),(3),(4),(5),(6),(7), and (14)."  Dkt. 51, ¶¶ 26-30.

### 1.    Mont. Code Ann. § 33-18-201(2)(3)(7)&(14)

John Alden moves to dismiss Count III to the extent it alleges violations of Mont. Code Ann. § 33-18-201(2),(3),(7), and (14) on the ground that claims under those statutory subsections are expressly barred by the UTPA.

Mont. Code Ann. § 33-18-242(1) provides that an insured "has an independent cause of action against an insurer for actual damages caused by the insurer's violation of subsection (1), (4), (5), (6), (9), or (13) of 33-18-201." Section 33-18-242 does not authorize a cause of action under subsections (2), (3), (7), (14).  As Mont. Code Ann. § 33-18-242(3) makes clear, an insured like Peterson who claims to have suffered damages as the result of the handling of an insurance claim may bring a cause of action for breach of contract, fraud, or violations of Mont. Code Ann. § 33-18-201(1), (4), (5), (6), (9), or (13) but may not pursue a claim under any other theory or cause of action.  See *Burton*, 30 M.F.R. at 182.  This means that Peterson's claims under § 33-18-201(2),(3),(7), and (14) are barred and must be dismissed.

### 2.    Mont Code Ann. § 33-18-201(1)(4)(5)&(6)

Peterson also alleges that John Alden engaged in "tortuous [sic] conduct" that violated subsections (1), (4), (5), and (6) of § 33-18-201. Dkt. 51, ¶ 27. These statutory subsections prohibit an insurer from misrepresenting pertinent facts or insurance policy provisions relating to coverage, refusing to pay claims without conducting a reasonable investigation based upon all available information, failing to affirm or deny coverage of claims within a reasonable time, or neglecting to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear. Mont. Code Ann. §33-18-201(1),(4)(5)&(6). Peterson alleges that he and his son "suffered special and general damages by reason of said tortuous [sic] conduct, including being forced to forego hea[l]th care," and accuses John Alden of acting with malice. Dkt. 51, ¶¶ 27-30.

While the Amended Complaint is short on factual detail, Peterson's central allegation is that he and his son "made claims upon the Defendants' policies covering Plaintiffs' health needs and the Defendants refused to cover the Plaintiffs and/or properly adjust their claims." Dkt. 51, ¶ 11. The record indeed reflects that Peterson submitted multiple claims for benefits under the Certificate between 2008 and 2011, seeking coverage for the cost of his own medical treatment. Dkt. 70-2, ¶¶ 29, 38-39, 41. And beginning in 2009, Peterson also submitted claims seeking

coverage for the cost of medical treatment provided to his son Joshua. Dkt. 70-2, ¶¶ 38, 40, 45. Because the Amended Complaint does not specify which of these many claims Peterson believes John Alden wrongfully denied or mishandled, John Alden moves for summary judgment on the ground that it has properly handled and processed all of Peterson's many claims, beginning in 2008 and continuing throughout the course of this litigation.

John Alden begins its supporting argument by citing Mont. Code Ann. § 33-18-242(5), which states that [a]n insurer may not be held liable under this section if the insurer had a reasonable basis in law or in fact for contesting the claim or the amount of the claim, whichever is in issue." John Alden maintains "there is no genuine dispute of material fact that [it] has properly processed each of Peterson's claims for insurance coverage, and that [it] conducted a reasonable, timely, and good faith adjudication of those claims." Dkt 70, at 29. According to John Alden, the undisputed evidence of record shows that it did not violate any of the UTPA's actionable provisions and Counts II and III of the Amended Complaint should be summarily dismissed.

For evidentiary support, John Alden relies primarily on the Banks-Matthews declaration summarizing the company's handling and payment of Peterson's claims. Dkt. 70-2. Banks-Matthews categorizes Peterson's claims

chronologically by year, and differentiates between the claims he submitted

seeking coverage for his own medical care, and the claims he submitted on behalf

of his son Joshua. Dkt. 70-2. For purposes of clarity, the Court will do the same.

>    a.    *Michael Peterson*

The Banks-Matthews declaration reflects that, in 2008, Peterson submitted

claims totaling $86,195.25 relating to his own medical care. Dkt. 70-2, ¶ 29.

Banks-Matthews explains that John Alden denied some of those claims because

they were for medical services provided before the July 1, 2008, effective date of

coverage. Dkt. 70-2, ¶¶ 34-35. Banks-Matthews also explains that because the

University of Utah Huntsman Hospital is not a participating provider, John Alden

initially processed some of Peterson's claims for coverage relating to his treatment

there between July and October 2008 at the 65% rate applicable to non-

participating providers. Dkt. 70-2, ¶ 32. Banks-Matthews indicates that John

Alden received some additional information in March 2009, at which time it

reprocessed the claims relating to Peterson's treatment at University of Utah

Huntsman Hospital as claims for emergency treatment and paid them at the higher,

80% participating provider rate. Dkt. 70-2, ¶ 33. Of the $86,195.25 in claims

Peterson submitted for services provided in 2008, John Alden ultimately

determined that $63,798.07 related to covered charges and paid a total $56,687.78.

Dkt. 70-2, ¶ 29. Banks-Matthews explains that in doing so, John Alden applied the first $5,000 of covered charges to Peterson's deductible and then began to process his claims in accordance with the terms of the Certificate. Dkt. 70-2, ¶ 36. Once Peterson had incurred an additional $3,500 in copayments relating to covered charges, Banks-Matthews states that John Alden paid 100% of his covered charges for the remainder of the coverage year (July 1, 2008 - June 30, 2009). Dkt. 70-2, ¶ 37.

Peterson argues that the Matthew-Banks declaration and John Alden's corresponding characterization of its claims handling during the 2008 calendar year contain a number "untruthful facts," making summary judgment inappropriate. Dkt. 76, at 4. He argues, for example, that John Alden knew he "had been referred to the University of Utah because of the rarity of [his] cancer and the lack of appropriate services offered in Hamilton, Montana" and wrongfully denied his claims or processed them "at less than 100 percent." Dkt. 76, at 5. But Peterson does not point to any evidence that John Alden was in fact aware of the circumstances surrounding his treatment at the University of Utah hospital. Peterson simply provides his own personal opinion as to what he believes John Alden knew or should have known. For example, Peterson states in his affidavit that he does not "believe that Assurant understands how small

Hamilton, Montana is or that Montanans routinely must travel large distances to receive health care." Dkt. 76-3, ¶ 116. And at the hearing, Peterson stated that he believed John Alden had all of his medical records when it paid his claims at the non-participating provider rate and should have known based on the information in those records that his treatment at the University Utah Huntsman Hospital was emergency treatment. But Peterson has not identified any specific medical records that he believes should have alerted John Alden that his treatment in Utah qualified as emergency care, and has not provided any evidence that John Alden had those medical records in its possession when it initially processed his claims. The Banks-Matthews declaration makes clear that John Alden initially processed Peterson's claims for his treatment in Utah at the non-participating provider rate because it "had no contrary information." Dkt. 70-2, ¶ 32.

Peterson also maintains that the "additional information" John Alden refers to in explaining why it reprocessed those claims in March 2009 "was immense pressure from Senator Jon Tester's office, [Peterson's] doctor, and the Montana Department of Insurance." Dkt. 76, at 6. Peterson argues that John Alden then paid a portion of his claims only because of this political pressure, not because it received additional information establishing that his treatment in Utah actually qualified as emergency care. Dkt. 76, at 6-7.

-23-

Other than his own speculation, the only evidence that Peterson points to in support of this theory is a December 29, 2008, letter that he received from the office of the Montana State Auditor asking for proof of Peterson's qualifying previous coverage so that the information could be immediately forwarded to John Alden. Dkt. 76-4. While this letter suggests that John Alden may not have had adequate information about Peterson's prior coverage, it does not somehow call Banks-Matthews' declaration into question. Banks-Matthews' declaration establishes that John Alden reprocessed and paid Peterson's claims at the participating provider rate because it received information in March 2009 showing that he had been treated at the University of Utah Huntsman Hospital for a sickness that had developed "suddenly and unexpectedly and if not treated immediately would" have endangered his life or cause him serious bodily impairment. Dkt. 70-4, at 24.

Peterson contends that John Alden still has not paid all of his claims for the medical care he received in 2008, and states that he disputes all of John Alden's "references to claims paid and dollar amounts." Dkt. 76, at 6, 7. But Peterson does not point to any evidence at all to actually bring the dollar amounts presented by John Alden into legitimate dispute. For summary judgment purposes, then, it is undisputed that in 2008 Peterson submitted claims for coverage totaling

$86,195.25. Dkt. 70-2, ¶ 29. It is also undisputed that, of the total amount submitted, John Alden found $63,798.07 related to covered charges and paid Peterson $56,687.78. Dkt. 70-2, ¶ 29. Nor has Peterson pointed to any evidence that John Alden's assessment as to the amount of covered charges was wrongful, or identified any specific charges that he believes should have been covered under the terms of the Certificate.

While Peterson complains generally that John Alden did not pay all of the claims he submitted in 2008, he has not come forward with any evidence showing that John Alden was obligated to do so under the terms of the Certificate. John Alden explains, for example, that it denied some of Peterson's claims because they were for services provided before the July 1, 2008, effective date of coverage. Dkt. 70-2, ¶¶ 34-35. To the extent Peterson argues there is a factual issue as to the effective date of coverage, his challenge is unavailing. John Alden has presented documentary evidence showing that Peterson asked to change the effective date of coverage from May 2, 2008, to July 1, 2008, because his COBRA coverage was paid through the end of June 2008. Dkt. 83 & 83-1. Although Peterson states in his affidavit that John Alden "would never honor that May 2, 2008, effective date of coverage," he does not deny that he is the one who asked to change that date to July 1, 2008. Dkt. 76-3, ¶¶ 38-39.

As for services provided after the effective date of coverage, John Alden states that it applied the first $5,000 of covered charges to Peterson's deductible, and then began to process his claims in accordance with the terms of the Certificate. Dkt. 70-2, ¶ 36. Once Peterson had incurred an additional $3,500 of covered charges in excess of the $5,000 deductible, Banks-Matthews states that John Alden paid 100% of his covered charges for the remainder of the coverage year. Dkt. 70-2, ¶ 37. John Alden's claims handling was consistent with the terms of the Certificate, pursuant to which Peterson could be responsible for up to $8,500 in covered charges each year. Dkt. 70-4, at 8. While Peterson makes repeated and sweeping assertions of wrongdoing by John Alden, he never points to a single claim for 2008 that John Alden failed to properly pay under the terms of the Certificate.

Finally, Peterson accuses John Alden of wrongfully denying some of his claims on the ground that his liposarcoma was a preexisting condition. Dkt. 76, 6-8. Once again, however, he fails to come forward with evidence of even one claim falling into this category. There is no evidence before the Court that John Alden denied any of Peterson's claims because his liposarcoma was a preexisting condition. Although the Certificate originally carried a rider identifying lipoma as a preexisting condition, by Peterson's own account John Alden removed that rider

effective July 1, 2008 – the day his coverage under the Certificate began. Dkt, 76-3, ¶ 117.

As the party seeking summary judgment, John Alden has satisfied its initial burden of producing evidence demonstrating that it properly handled and processed the claims Peterson submitted in 2008, and Peterson has not pointed to any evidence to the contrary. Even if he had, those claims would nonetheless be barred to the extent they are based on conduct prior to May 25, 2009. Mont. Code Ann. § 33-18-242(7) provides a two year statute of limitations for first-party actions brought under the UTPA. Because Peterson did not file his original complaint in this case until May 25, 2011, Peterson's UTPA claims would be barred to the extent they are premised on John Alden's alleged conduct prior to May 25, 2009. Dkt. 1.

As Peterson's affidavit, testimony, and briefs all reflect, the vast majority of his bad faith claims in this case are based on John Alden's alleged conduct in wrongfully denying and delaying payment of his claims for coverage of the cancer treatment he received in 2008, both in Utah and Montana. Of the 149 paragraphs in Peterson's responsive affidavit, only three specifically address John Alden's alleged conduct in mishandling the claims he submitted 2010 and 2011 seeking coverage for the cost of his own medical care. Dkt. 76-3, ¶¶ 130, 146, 147.

Peterson's testimony at the hearing was much the same, centering on allegations that John Alden wrongfully identified his liposarcoma as a preexisting condition and did not timely pay his claims for the cost of the medical care he received in 2008. Peterson's testimony also focused on John Alden's alleged bad faith conduct in refusing to pay his claims for coverage relating to his treatment in Utah during the summer of 2008 at the participating provider rate, and ignoring evidence that the medical care he received there qualified as emergency treatment. Even if Peterson had submitted some documentary evidence to substantiate those allegations, which he has not, all of these claims are unequivocally barred by the UTPA's two year statute of limitations.

To the extent Peterson complains of John Alden's conduct after May 25, 2009, John Alden has come forward with similar evidence that it properly handled and processed the claims Peterson submitted between 2009 and 2011. In 2009, for example, the Banks-Matthews declaration establishes that Peterson submitted claims for coverage totaling $9,079.82. Dkt. 70-2, ¶ 38. Of that amount, John Alden determined that $8,760.58 related to covered charges. After accounting for the $5,000 deductible and other factors like co-pays, John Alden paid $2,848.47. Dkt. 70-2, ¶ 38. In 2010, Peterson submitted claims for coverage totaling just $4,634.61. Dkt. 70-2, ¶ 39. Although John Alden concluded that $2,871.20

related to covered charges, it determined that it had no payment obligations under the Certificate in light of the $5,000 deductible. Dkt. 70-2, ¶ 39.

Peterson again states that he disputes all of John Alden's "references to claims paid and dollar amounts" as well as its determination that it had "no payment obligations" until the $5,000 deductible was satisfied. Dkt. 76, at 6-7. But Peterson has not come forward with any evidence contradicting John Alden's calculations regarding the claims submitted and paid in 2010. Nor has Peterson pointed to any evidence that John Alden wrongfully denied or delayed payment of all amounts due under the Certificate for the claims he submitted in 2010.

For the most part, Peterson has likewise failed to come forward with any evidence suggesting that John Alden wrongfully denied or delayed payment of the claims he submitted in 2009. Peterson did, however, introduce two checks as exhibits at the motion hearing convened by the Court on February 27, 2012. Both of those checks are dated October 11, 2011, and were issued from Defendant Time Insurance Company payable to the First Choice Medical Walk In Clinic. As the Remittance Advice attached to each check indicates, one was for payment of $6.75 on a $45.00 claim with an October 31, 2009, service date, and one was for payment of $3.75 on a $25.00 claim with a September 21, 2009, service date. Dkt. 93. The Court cannot tell from the face of these documents when the two claims

were originally submitted, and has no information as to how John Alden handled and processed the claims.  Because Peterson did not present these two documents until the motion hearing, John Alden has not yet had the opportunity to address their significance, if any, in the overall context of this case or present any evidence as to how those two particular claims were handled and processed.  Thus, John Alden will be given the chance to address these two claims.  To the extent Peterson takes the position that John Alden wrongfully delayed payment of these two particular claims, the Court will defer making a recommended ruling on John Alden's motion as it pertains to these two claims and give the parties the opportunity to supplement the record with information regarding the handling and processing of these two particular claims.

As of November 21, 2011, which marks the approximate date of John Alden's summary judgment motion, Peterson had submitted claims for charges totaling $14,121.86 for medical treatment he received in 2011.  Dkt.  70-2, ¶ 41.  Banks-Matthews explains that John Alden initially found that some of those claims related to non-covered charges because they fell within the exclusion for genetic testing services.  Dkt. 70-2, ¶ 42. In August 2011, however,  Peterson contacted John Alden and asked that it review those claims.  Dkt. 70-2, ¶ 43.  John Alden agreed to conduct a review, and in September 2011 received medical

records establishing that Peterson had been diagnosed with Li-Fraumeni Syndrome, a rare genetic condition that makes Peterson highly susceptible to cancer. Dkt. 70-2, ¶ 42-43. According to Banks-Matthews, within ten days of receiving those medical records John Alden determined that the Certificate's exclusion for genetic services did not in fact apply and reprocessed Peterson's claims. Dkt. 70-2, ¶ 43. John Alden determined that of the $14,121.86 in claims submitted by Peterson, $13,182.52 related to covered charges, and paid $6,245.89. Dkt. 70-2, ¶ 41.

Once again, Peterson fails to present any evidence to contradict that presented by John Alden and relies exclusively on general allegations of wrongdoing. Peterson states in his personal affidavit, for example, that:

> Assurant breaks down the payment of bills and picks an arbitrary and random date of November 21 to figure the remainder of 2011 bills. Assurant claims that after November 21, 2011, I incurred $14,121 in bills and they paid only $6,245. With a $5,000 deductible, even Ray Charles can see that Assurant Health is not paying what it promised to pay for my health coverage.

> Dkt. 76-3, ¶ 147.

But Peterson fails to account for the many other contractual terms affecting the parties' respective payment obligations under the Certificate, and has not identified a single claim submitted in 2011 that was wrongfully denied. And while

Peterson complains that John Alden has arbitrarily picked November 21, 2011, as the end date for purposes of its calculations, that selection was certainly reasonable in light of the fact that John Alden filed the pending motions to dismiss and for summary judgment just nine days later.

b.    *Joshua Peterson*

Beginning in 2009, Peterson also submitted claims for benefits seeking coverage for the cost of his son Joshua's medical treatment.  Dkt. 70-2, ¶¶ 29, 38. Banks-Matthews states that in 2009, Peterson submitted claims for Joshua's treatment totaling $3,85369.  Dkt. 70-2, ¶ 38.  Of that amount, John Alden determined that $3,397.94 related to covered charges Dkt. 70-2, ¶ 38.  But because those charges did not exceed the $5,000 deductible, John Alden concluded that it had no payment obligations under the Certificate with regard to those claims.  Dkt. Dkt. 70-2, ¶ 38.  According to Banks-Matthews, Peterson's claims for the cost of Joshua's medical care in 2010 totaled $2,924.25.  Dkt. 70-2, ¶ 40.  John Alden determined that $1,869.56 related to covered charges, but in light of the $5,000 deductible once again concluded that it had no payment obligations under the Certificate.  Dkt. 70-2, ¶ 40.

Peterson does not offer anything more to counter this evidence than he did to counter the evidence discussed above.  While Peterson states that he disputes all

of John Alden's "references to claims paid and dollar amounts,"[10] he does not cite to any materials of record calling those numbers into question. Nor has Peterson identified any specific claims that he believes John Alden wrongfully denied, or pointed to evidence of any claims that John Alden failed to pay in accordance with the terms of the Certificate.

Peterson also submitted claims seeking coverage for the cost of Joshua's medical care in 2011. Dkt. 70-2, ¶ 45. As Banks-Matthews explains, however, because Peterson had removed Joshua from coverage under the Certificate as of September 1, 2010, Joshua "was no longer a Covered Person under the Certificate and [John Alden] had no payment obligations under the Certificate with respect to such claims." Dkt. 70-2, ¶ 45. This explanation is substantiated by the undisputed evidence of record.

John Alden has submitted a copy of a letter Peterson wrote stating: "I, Michael Peterson, policy number 0060179910, would like to remove my son Joshua Peterson from my policy. This change would be effective September 1, 2010." Dkt. 70-8. John Alden did as Peterson requested, and on September 10, 2010, sent Peterson a letter confirming that it had removed Joshua from coverage under the Certificate. Dkt. 70-9.

_____

[10] Dkt. 76, at 7.

Peterson apparently changed his mind a few months later. On January 21, 2011, an agent submitted an enrollment form on Peterson's behalf requesting that John Alden add Joshua as a covered dependent under the Certificate. Dkt. 70-10. But because Peterson had not answered several of the health questions contained on the enrollment form, John Alden returned the form to him with instructions to "please return application with all health questions (11 thru 27) answered for Joshua." Dkt. 70-10, at 5-6; Dkt. 70-11. As of February 9, 2011, Peterson still had not returned the completed form so John Alden advised him in writing that it had discontinued its review of his request to add Joshua as an insured. Dkt. 70-12.

Peterson does not dispute that he removed Joshua from coverage effective September 1, 2010, but complains in his affidavit that John Alden wrongfully denied his request to add Joshua back on as an insured. Dkt. 76-3, ¶¶ 134-36. Peterson describes the scenario as follows:

> Recently in 2011, Assurant claims that my re-enrollment form for Joshua was incomplete and therefore they cannot cover Joshua.

> However, Assurant never states specifically what the incomplete portion of the enrollment form was.

> This denial based on a phantom incomplete enrollment form, is yet another layer of denial and deceptive practices by Assurant.

> Dkt. 76-3, ¶¶ 134-36.

Peterson's allegations are flatly contradicted by the uncontroverted evidence of record.  John Alden has submitted a copy of the incomplete enrollment form and its letter telling Peterson exactly which questions he needed to answer before the application could be processed.  Dkt. 70-10 & 70-11.

Peterson does not claim to have provided John Alden with the information it requested.  Nor does Peterson challenge John Alden's right to conduct an underwriting review to determine whether Joshua, who was 19 years old at the time,[11] qualified for coverage under the Certificate.  John Alden's decision to conduct an underwriting review was consistent with its obligations under Section 2417 of the Patient Protection and Affordable Care Act ("PPACA"), 124 Stat. 120, Pub. L. 111-48, March 23, 2010, and its implementing regulations.  See 45 C.F.R. §§ 147.210 & 147.108.

## C.  Breach of Contract

Peterson's Amended Complaint includes a breach of contract claim (Count I)  alleging that "[t]he Defendants refused to pay the Plaintiffs' claims and/or provide coverage" under the Certificate.  Dkt. 51, ¶¶ 13-14.  John Alden argues that this claim should be disposed of on summary judgment because Peterson has

---

[11] Dkt. 70-3, at 1 (original enrollment form identifying January 3, 1992, as Johshua's birthdate).

not pointed to any evidence that it breached the terms of the Certificate.

As discussed at length above, the Banks-Matthews' declaration and other documentary evidence submitted by John Alden shows that it has paid all of Peterson's claims since 2008 in accordance with the terms of the insurance contract.   Because that evidence shows that Peterson received all of the benefits to which he was entitled under the Certificate,  John Alden has satisfied its initial burden with a properly supported motion showing that it is entitled to judgment as a matter of law on Peterson's breach of contract claim.

To defeat John Alden's properly supported motion, then, Peterson was required to come forward with evidence showing that there is a genuine issue of material fact regarding his breach of contract claim.  But Peterson has not submitted admissible evidence of even one claim that John Alden failed to properly pay in accordance with the terms of the Certificate.[12]  As discussed above, for example, while Peterson states that he disputes all of the amounts John Alden states it has paid, he has not pointed to any evidence to contradict John Alden's calculations.

---

[12] As noted above, Peterson submitted two checks as exhibits at the February 27, 2012, motion hearing.  As with Peterson's bad faith claim, John Alden will be given the opportunity to address those two exhibits as they may bear upon Peterson's breach of contract claim.

As to those amounts John Alden did not pay, Bank-Matthews provides several explanations. As discussed above, for example, Banks-Matthews states that John Alden denied many of Peterson's claims because they did not relate to covered charges within the meaning of the Certificate. Peterson has not come forward with any evidence to the contrary, and does not identify any claims for covered charges that he maintains should have been paid under the terms of the Certificate but were not. Banks-Matthews also explains that John Alden denied several claims that related to treatment provided before the July 1, 2008, effective date of coverage. As discussed above, the undisputed evidence of record establishes that Peterson asked for his coverage to commence on July 1, 2008. To the extent Peterson maintains John Alden breached the terms of the Certificate by not paying claims for treatment he received before the effective date of coverage, his breach of contract claim fails as a matter of law.

Peters also maintains that John Alden breached the terms of the insurance contract by initially paying his claims relating to his treatment in Utah at the non-participating provider rate. As discussed above, however, he has not submitted any evidence to substantiate his allegations that John Alden should have known based on the records in its possession at the time that his Utah treatment qualified as emergency care. The Banks-Matthews affidavit establishes that John Alden

reprocessed those claims once it received additional information and has since paid them at the participating provider rate.

Peterson's brief and affidavit are certainly replete with allegations that John Alden did not pay what was required by the insurance contract, but he has simply failed to come forward with any documentary evidence to substantiate those allegations. Because Peterson has not pointed to any evidence that John Alden breached its contractual obligations in handling, processing, and paying Peterson's claims under the Certificate, John Alden's motion for summary judgment as to Count I of the Amended Complaint should be granted.

## III.  **Conclusion**

Based on the foregoing,

IT IS ORDERED that the parties may, on or before March 19, 2012, file a supplemental brief (not to exceed 5 pages) addressing the significance of the two checks submitted by Peterson at the hearing and supplement the record with additional information regarding John Alden's handling and processing of those two claims. And the parties may, on or before March 22, 2012, file a brief (not to exceed 5 pages) in response to any supplemental brief filed by the opposing party. The Court will defer issuing a recommended ruling on the question of whether or not Peterson can pursue a bad faith or breach of contract claim based solely on

John Alden's handling and processing of those two claims pending expiration of this briefing schedule.  In all other respects,

IT IS RECOMMENDED that Defendants Time Insurance Company's, Assurant Health's, and John Alden Life Insurance Company's Motion to Dismiss and for Summary Judgment be GRANTED.

Dated this 8th day of March, 2012

 /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge